IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CYNTHIA COLLINS, | ) | CASE NO. 1:15-cv-02305 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF | ) | THOMAS M. PARKER |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

## I.  Introduction

Plaintiff, Cynthia Collins ("Collins"), seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits under Title II of the Social Security Act.  This matter is before the court pursuant to 42 U.S.C. §1383(c)(3), 42 U.S.C. §405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be VACATED and REMANDED.

## II.  Procedural History

Ms. Collins ("Collins") applied for Disability Insurance Benefits (DIB) on April 20, 2012.  (Tr. 325-328)  Ms. Collins's application was denied initially on July 10, 2012 (Tr. 212-214) and after reconsideration on October 22, 2012.  (Tr. 218-224)  On November 6, 2012, Ms. Collins requested an administrative hearing.  (Tr. 225)

The administrative hearing took place before Administrative Law Judge (ALJ) Pamela E. Loesel on March 20, 2014.  (Tr. 154-190)  On April 3, 2014, the ALJ issued a decision finding

that Ms. Collins was not disabled.  (Tr. 130-153)  On June 22, 2015, the Appeals Council denied

review, rendering the ALJ's April 3, 2014 decision final. (Tr. 6-11)

On November 10, 2015, Ms. Collins filed this case in order to obtain judicial review of

the Commissioner's final agency action.

(Doc. 1)  Defendant answered and filed the transcript of the administrative proceedings on

February 11, 2016. (Docs. 12 and 13)  Plaintiff filed her brief on the merits on May 11, 2016

(Doc. 19) and Defendant filed her brief on the merits on June 23, 2016 (Doc. 20), making the

matter ripe for this court's review.

## III.  Evidence

### A.  Personal, Educational and Vocational Evidence

Ms. Collins was born on July 31, 1961 and was 47 years old on her alleged disability

onset date of March 29, 2009.  (Tr. 146)  She is currently married and has three adult children.

(Tr. 163)  Her past relevant work includes work as a cotton machine operator; a utility worker;

and a quality control/general inspector.  (Tr. 145)

### B.  Medical Evidence

#### 1.  Medical Records Related to Physical Impairments

The relevant medical records are summarized herein.  Plaintiff fell at work and sprained

her right ankle on March 19, 2009.[1]  (Tr. 387, 392)  She was given an air splint and crutches.

(Tr. 387-388)  Plaintiff returned to work the next day but fell again at work. (Tr. 386-7)  On

March 20, 2009, she returned to the emergency department complaining of left knee pain.  (Tr.

---

[1] The court notes that while Exhibit 1F purports to be records from plaintiff's emergency department visit of March 19, 2009, in fact that exhibit consists of records from plaintiff's March 20, 2009 visit to the emergency department at Metro Health Medical Center, when she fell for the second time.  Given the recommendation for reversal and remand, this issue is not significant at the current time but would need to be corrected during later proceedings.

387-398)  The emergency room physician, Dr. Janet M. Poponick, examined plaintiff's knee and did not observe any swelling or instability; a contusion was diagnosed.  (Tr. 397)  Plaintiff was discharged with a walker.  (Tr. 398)

Plaintiff presented to Dr. Ashok Patil on March 25, 2009.  (Tr. 438-440)  Dr. Patil observed left knee swelling and tenderness over the anterior, medial and lateral aspect.  He also observed reduced range of motion.  (Tr. 439)  Dr. Patil diagnosed a right knee strain, right ankle strain, left knee strain/contusion and left wrist sprain.  (Tr. 440)  He prescribed 800 mg Motrin and indicated that he did not think she would be able to return to work until April 2, 2009.  (Tr. 440)

Due to continued pain, plaintiff underwent MRIs of both of her knees on August 14, 2009.  (Tr. 406-407)  The MRI of plaintiff's left knee showed mild degenerative chondral changes and a small popliteal cyst which appeared to communicate with a thin tubular ganglion cyst extending along the posteromedial aspect of the knee at the medial femoral condyle.  The MRI of plaintiff's right knee showed degenerative chondral changes in the patellofemoral compartment.  (Tr. 407) There was no evidence of a meniscus tear or ligament injury in either knee.  (Tr. 407)

Dr. Patil referred plaintiff to an orthopedic surgeon, Dr. William R. Bohl.  (Tr. 436-437) Plaintiff presented to Dr. Bohl on November 11, 2009.  (Tr. 436-437)  Dr. Bohl found that plaintiff was still symptomatic from aggravation of preexisting chondromalacia of both patellas and a residual laxity in her right ankle from a ligament tear.  (Tr. 437)  Dr. Bohl recommended that plaintiff take Naprosyn and do physical therapy, but did not believe that a cane or knee sleeves were necessary.  (Tr. 437)

Over one year later, plaintiff went to the emergency department on May 16, 2010

complaining of recent falls due to weakness and pain in her right knee.  (Tr. 408-418)  She was discharged with crutches and diagnosed with right knee pain and concern for sprained lateral collateral ligament. (Tr. 408-418)

With the help of her daughter, plaintiff completed a symptoms report on May 17, 2012. (Tr. 357)  She stated that she suffered from pain, weakness, dizziness, fatigue and learning disabilities.  (Tr. 357)  On June 25, 2012, plaintiff completed a functions report. (Tr. 361)  In this report she stated that her feet were numb, she could not read or spell, and that she had trouble standing and walking.  (Tr. 361, 366)  She reported that she was able to do most household tasks but that it took her a long time and increased her pain.  (Tr. 363)

On June 1, 2010, Ms. Collins was seen by a MetroHealth family practice physician for follow-up on her diabetes.  (Tr. 453)  She had no diabetic complications but complained of knee pain during the appointment. (Tr. 454)  Plaintiff was given TED hose for leg swelling and bilateral knee x-rays were ordered.  (Tr. 454-455)  The x-ray images revealed mild generalized osteopenia without acute body abnormalities, a mild degree of tricompartmental osteoarthritis, and minimal intra medullary calcifications in the right distal femur.  (Tr. 456)

Plaintiff saw Dr. Lisa Roth, a podiatrist, on January 17, 2013.  (Tr. 605-606)  Plaintiff complained of raw feelings on the top of her feet, and pain, burning and numbness of the three smaller toes on her left foot.  (Tr. 605)  Dr. Roth diagnosed diabetic peripheral neuropathy and referred Ms. Collins back to her primary care physician for medication.  (Tr. 605-606)  Ms. Collins' primary care physician gave her a prescription for Neurontin in April 2013.  (Tr. 612)

Plaintiff started physical therapy on May 16, 2013.  Her biggest complaints were fear of falling, difficulty with walking and pain.  (Tr. 622)  Plaintiff reported that she was having difficulty cleaning, vacuuming, doing dishes and could stand for only intermediate periods of

4

time. (Tr. 622) An assessment of plaintiff's physical condition revealed decreased left knee flexion, decreased bilateral hip strength, decreased flexibility, decreased single leg squat, decreased ability to squat/kneel/rise from sit to stand and decreased ability to function. (Tr. 624) At her physical therapy session on October 7, 2013, it was noted that plaintiff's range of motion, strength, flexibility and function were improved and she was encouraged to continue with home exercises. (Tr. 721) Examination revealed ongoing crepitus with sitting, standing and squatting; pain with ascent from a squat; slow gait; and decreased left stance time. (Tr. 721)

Dr. Bou of MetroHealth's Physician Medicine and Rehabilitation Department performed a functional capacity evaluation of plaintiff on October 18, 2013. (Tr. 748-753) Dr. Bou found that plaintiff could lift 20 pounds occasionally and 10 pounds frequently; could stand for at least two hours and sit for a total of about six hours in a workday; could occasionally climb, stoop, kneel and crouch and could frequently balance and craw. (Tr. 753) Dr. Bou did not believe that plaintiff was a likely disability candidate. (Tr. 753) A functional capacity form, identifying the same restrictions was completed by Dr. Stevens at the MetroHealth Medical Center on the same day plaintiff met with Dr. Bou. (Tr. 763-769)

In December 2013, plaintiff developed swelling and numbness of her big toe on her left foot. (Tr. 798, 849) Plaintiff was diagnosed with left great toe cellulitis. (Tr. 801) She was advised to keep her foot elevated and told she would be hospitalized if there was no improvement. (Tr. 803) On January 1, 2014, surgery was performed on plaintiff's left hallux to remove a deep foreign body and plaintiff was placed in a post-op shoe and advised to ice and elevate her left foot for pain and swelling control. (Tr. 869, 871, 926) On February 6, 2014, plaintiff was told to transition to a regular shoe as tolerated. (Tr. 929)

On February 14, 2014, plaintiff presented to MetroHealth with left knee pain and was

instructed to use a heating pad. (Tr. 940, 942)

### 2.   Medical Evidence Related to Mental Impairments

Plaintiff received treatment for her mental health from Richard Duval, Ph.D., beginning on August 2, 2013 and continuing through at least February 2014.  (Tr. 770-785, 948-949) Plaintiff reported that she had last worked in 2009 when she was hurt at work and was unable to work since that time due to a "combination of issues – physical, psychological, reading."  (Tr. 777)  She told Dr. Duval that she experienced depression because she was unable to do the things she used to do, and stated that she "love[d] working, but I just can't get a job.  Tried GED a couple of times, couldn't do it, never took the test."  (Tr. 777)  Plaintiff reported that she spent most days at home and was able to drive and get groceries.  (Tr. 777)  She also reported going to the doctor and walking to her daughter's home next door. (Tr. 777)  Plaintiff expressed concerns about her future.  (Tr. 777)

Dr. Duval found that Ms. Collins was depressed, anxious, somatic, sensitive, fearful, unsure of herself, overwhelmed and unable to read.  (Tr. 772-775, 777, 779-780, 782-783, 785) Dr. Duval referred plaintiff to her primary physician for a medication evaluation.  (Tr. 779, 781) At subsequent counseling sessions, plaintiff seemed to be doing better and was being more active after starting medication treatment. (Tr. 771, 773, 775, 783)  On February 27, 2014, Dr. Duval completed a medical source statement regarding plaintiff's mental capacity.  (Tr. 948-949)

### C.  Opinion Evidence

### 1.   Treating Physician – Dr. Patil – May 2012

On May 15, 2012, Dr. Patil completed a form regarding his treatment of plaintiff. (Tr. 434-435) Dr. Patil indicated that he had last seen plaintiff on December 8, 2010. (Tr. 434)  His diagnosis was right knee strain, right ankle strain, contusion to left knee and chondromalacia

patella of both knees.  (Tr. 434)  Dr. Patil listed his physical examination findings as swelling, tenderness and weakness of both knees. (Tr. 434)  He stated that physical therapy had provided partial relief.  (Tr. 435)  In listing plaintiff's limitations, Dr. Patil opined that she could not stand or walk for prolonged periods and could do only minimal stair claiming.  (Tr. 435)

### 2.  Treating Psychologist – Richard J. Duval, Ph.D. – February 2014

Dr. Duval completed a medical source statement regarding plaintiff's mental capacity on February 27, 2014.  The source statement was expressed on a checklist-type form that offered little to no substantiation for the opinions expressed.  (Tr. 948-949)  Dr. Duval diagnosed depression, irritability, sadness, and decreased energy.  (Tr. 949)  He opined that plaintiff would be able to frequently follow work rules; use judgment; maintain regular attendance and be punctual; work in coordination with or proximity to others without being distracting; relate predictably in social situations; and manage funds. (Tr. 948-949)  Dr. Duval opined that plaintiff could only occasionally maintain attention and  concentration for extended periods of two hour segments; respond appropriately to changes in routine settings; relate to co-workers; interact with supervisors; work in coordination with or proximity to others without being distracting; understand remember and carry out complex job instructions; understand, remember and carry out detailed, but not complex job instructions; socialize; behave in an emotionally stable manner and leave home on her own.  (Tr. 948-949)  Dr. Duval opined that plaintiff would rarely be able to deal with the public; function independently without redirection; deal with work stress; complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 948)

### 3. Consulting Psychologist – Raymond D. Richetta, Ph.D.

On August 20, 2012, Raymond D. Richetta, Ph.D. reviewed plaintiff's records and conducted a psychological examination of plaintiff on behalf of the Bureau of Workers' Compensation.  (Tr. 525-530)  Dr. Richetta reported that plaintiff was well-groomed, had a normal demeanor and was fully cooperative.  (Tr. 525)   He further reported that plaintiff became depressed after a work-related injury in 2009.  (Tr. 525-526)  At the time of his examination, plaintiff denied every undergoing any mental health treatment or taking any medication for anxiety or depression. (Tr. 527)  Plaintiff reported having a positive relationship with her children and husband.  (Tr. 527)

Dr. Richetta noted that Ms. Collins had trouble reading and determined that she had developed an adjustment disorder with depressed mood, chronic. (Tr. 529-530)  He concluded that, as a result of her disorder, plaintiff experienced sadness with tears, very reduced concentration, reduced persistence, insomnia, and reduced energy, which precluded her from returning to work as a quality control inspector. (Tr. 530)   Dr. Richetta recommended psychotherapy and a psychiatric consultation to address psychiatric medication needs.  (Tr. 530)  Apparently, plaintiff began seeing Dr. Duval in response to this recommendation.

### 4. Reviewing Physician – Linda Hall, M.D. – July 2012

On July 10, 2012, Linda Hall, M.D. reviewed plaintiff's medical records and opined that plaintiff could perform light work.  (Tr. 194-195)  Dr. Hall found plaintiff's statement that she could lift 20 pounds, could not stand long, could not kneel on the right and could only walk for 30 minutes at a time to be fully credible and supported by the objective evidence in the record.

### 5. Reviewing Physician – Elizabeth Das, M.D. – October 2012

On October 18, 2012, Elizabeth Das, M.D. reviewed plaintiff's medical records and

opined that plaintiff could perform light work.  (Tr. 206-207)

### 6.  Reviewing Psychiatrist – Bruce Goldsmith, Ph.D. – October 2012

On October 19, 2012, Bruce Goldsmith, Ph.D. reviewed plaintiff's records and determined that plaintiff's affective disorder was not severe.  (Tr. 204-205)  This conclusion was based on his finding that plaintiff suffered only "mild" restrictions on activities of daily living, "mild" difficulties in maintaining social functioning, and "mild" difficulties in maintaining concentration, persistence and pace.  He found that there was no evidence that plaintiff had suffered repeated episodes of decompensation.  (Tr. 205)

### D.  Testimonial Evidence

#### 1.  Testimony of Ms. Collins

A hearing before the ALJ was held on March 20, 2014.  (Tr. 154)  At the commencement of the hearing, counsel for Ms. Collins amended her alleged onset from March 29, 2009 to July 30, 2011.  (Tr. 157)

Ms. Collins testified that she lived in Cleveland, Ohio with her husband of 35 years.  (Tr. 162)  Ms. Collins was able to do dishes, wash clothes, vacuum and cook.  (Tr. 162)  However, she had been having more difficulty cleaning her house because of her knee pain. (Tr. 177)  She was no longer able to wipe down walls or scrub her carpets every three months.  (Tr. 177)  She went grocery shopping once a week with one of her daughters.  (Tr. 162)  Ms. Collins drove herself to the hearing.  (Tr. 164)

During a typical day, Ms. Collins would get up at 4:30, help her husband prepare for work, go next door to her daughter's house to get the kids ready for school, and then spend the rest of the day at her daughter's house until her husband got home from work.  (Tr. 165)  She also watched television, used a computer and a cell phone.  (Tr. 164)  She used Facebook and

played video games on the computer. (Tr. 165)

Ms. Collins had not been employed since March 21, 2009. (Tr. 166) In 1997, Ms. Collins had started working for Megas Beauty Care as a machine operator. (Tr. 167) At that position, she stood the whole time and lifted bags of cotton that weighed 20 to 50 pounds. (Tr. 167-168) She would sometimes be required to adjust or repair the machines by using tools to change the machine guides.(Tr. 169-70) Larger repairs were handled by the maintenance department. (Tr. 170) Ms. Collins was also required to lift a cover on the machine which weighed approximately 15 to 20 pounds. (Tr. 171)

Megas Beauty later became U.S. Cotton and Ms. Collins continued working there from 2001 to 2009 in quality control and as a group leader of six machines. (Tr. 166) In quality control, Ms. Collins got cotton balls, counted them, checked their size and went to the water tank to collect water. (Tr. 171) She was on her feet for that job except when she was counting or measuring the cotton balls. (Tr. 172) She sat approximately two hours per shift. (Tr. 172) Also at that job, Ms. Collins was required to lift cases of cotton swabs that weighed approximately 30 pounds. (Tr. 173)

Ms. Collins testified that she was no longer working because she fell in the parking lot at work and hurt her ankle. (Tr. 173) After she fell, her employer sent her to the emergency department. (Tr. 173) The emergency department physician told her that she could return to work but she did not think she was able to do so. (Tr. 173) She then went to Metro hospital where she received crutches. (Tr. 173) She went back to work the next day but fell again on her knee while in the restroom and was taken back to the emergency department. (Tr. 174) After that, Ms. Collins never returned to work. (Tr. 174)

Ms. Collins received workers' compensation for seven months and was then laid off. (Tr.

10

174) She applied for various quality control positions while she was receiving unemployment benefits but was never contacted by any potential employers. (Tr. 177-78)

Ms. Collins testified that she would not be able to return to her former position at U.S. Cotton because she would need breaks more often and would be less productive because her knees were weak and hurt. (Tr. 175) She testified that sometimes her legs ached and caused poor sleep.  (Tr. 177)    She no longer received electrical stimulation or injections for her knees. (Tr. 175)  Surgery had not been recommended.  (Tr. 175)   For pain, Ms. Collins was taking 400 milligrams of Ibuprofen or prescription strength Tylenol three times a day. (Tr. 176)

When questioned by her attorney, Ms. Collins testified that her knees tightened, swelled, and felt weak - like she might fall.  (Tr. 179)  In 2010, she had fallen four more times in addition to the two falls at her former place of employment. (Tr. 179)  She was prescribed braces for her knees and she used them approximately one week out of each month. (Tr. 179)  She had also been diagnosed with diabetes.  (Tr. 180)

Ms. Collins explained that she did not have much feeling in her feet but did experience a burning sensation in them. (Tr. 180)   She had recently had surgery to remove a needle in her toe that she did not even know was there.  (Tr. 180)  She further stated that her feet felt numb if she wore shoes. (Tr. 181)  She took Gabapentin for the pain in her feet which was helpful. (Tr. 181) However, that medication was not as effective now as when she had first begun taking it. (Tr. 181)  She had been prescribed Oxycodone at the time of her toe surgery but was no longer taking it. (Tr. 182)

Ms. Collins testified that she could be engaged in one activity (such as household chores) for about an hour and a half before needing to take a break and sitting down. (Tr. 182)  She further stated that she took at least 10 breaks a day because her legs started aching and swelling.

11

(Tr. 183)

## 2.  Vocational Expert's Testimony

Vocational Expert ("VE"), Brett Salkin, testified at the hearing.  (Tr. 183-190)  The VE considered plaintiff's past relevant work to be a machine operator, a utility worker and a general inspector.  (Tr. 184-85)

For the first hypothetical question, the ALJ instructed the VE to consider a hypothetical individual with the same age, education and past work history as Ms. Collins.  (Tr. 185)  He was asked to further assume that the individual could occasionally lift 20 pounds and 10 pounds frequently; was able to stand and walk six hours in an eight-hour work day; was able to sit for six hours in an eight-hour work day; was unlimited in her ability to push and pull other than already described for lifting and carrying; she could occasionally climb ramps and stairs; could never climb ladders, ropes or scaffolds and could occasionally kneel, crouch and crawl.  (Tr. 185)

The ALJ asked the VE if this hypothetical individual could perform any of the past jobs of Ms. Collins.  (Tr. 160)  In response, the VE stated that such a hypothetical individual could perform the cotton machine operator and the quality control positions as classified but not as actually performed.  (Tr. 186)

For the second hypothetical, the ALJ asked the VE to consider the same hypothetical individual but to further assume that the individual would require extra breaks, above standard breaks.  There would be approximately two breaks in the morning and two breaks in the afternoon in order for the individual to rest and elevate her legs.  (Tr. 186)

The ALJ asked the VE if this hypothetical individual could perform any of the past jobs of Ms. Collins.  (Tr. 186)  The VE responded that this hypothetical individual could not perform any of the past identified work and that there would not be any other jobs for this individual.

12

(Tr. 186)

For the third hypothetical, the ALJ asked the VE to consider a different hypothetical individual with the same age, education and past work history as Ms. Collins; who was able to occasionally lift 20 pounds and 10 pounds frequently; was able to stand and walk for two hours in an eight-hour work day; was able to sit for six hours in an eight-hour work day; would have unlimited abilities to push and pull other than already described for lifting and carrying; could occasionally climb ramps and stairs; could never climb ladders, ropes or scaffolds and could occasionally kneel, crouch and crawl.  Additionally, this individual could sit for an uninterrupted 60 minutes and could stand for 30 minutes at a time.  (Tr. 186-78)

The ALJ asked the VE if said hypothetical individual could perform any of the past jobs of Ms. Collins and the VE responded that this individual could not perform any of the past identified work.  (Tr. 187)  The ALJ then asked the VE if there were any jobs that this individual could perform at an unskilled, light exertional level.  (Tr. 187)  The VE stated that such an individual could perform a sewing machine operator with 250 positions reporting in the Cleveland labor market; 1,200 in the state of Ohio and 40,000 in the national economy.  Such an individual could also be an office helper with 500 positions in Cleveland, 2,000 in Ohio and 83,000 in the national economy; and such an individual could be a mail clerk with 450 positions in Cleveland, 2,400 in Ohio and 63,000 in the national economy.  (Tr. 187-88)

For the fourth hypothetical, the ALJ asked the VE to further assume that the hypothetical individual would require extra breaks, two times in the morning, two times in the afternoon for fifteen minutes at a time, in order to rest and elevate legs.  (Tr. 188)  The VE opined that there would not be any jobs for this individual.  (Tr. 188)

When asked whether his opinion testimony was "consistent with the information found in

the *Dictionary of Occupational Titles* and its companion publication *Selected Characteristics of Occupations* defined in the revised DOT," the VE testified: "It is as far as it goes.  I have responded to your questions on sitting intervals and standing intervals and the breaks based on my training and experience in job placement and retention."  (Tr. 188)

Counsel for Ms. Collins then asked the VE to reconsider hypothetical number three but to assume that the individual would be restricted to simple, routine work activity where reading was not a job requirement.  (Tr. 189)  The VE opined that the position of office helper would be eliminated due to a reading requirement.  (Tr. 189)  Counsel did not cross examine the VE concerning his response on the consistency of his opinions with the *Dictionary of Occupational Titles*, etc.

## IV.     Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2]….

42 U.S.C. § 423(d)(2)(A).

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,13 claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

**V.      The ALJ's Decision**

The ALJ issued a decision on April 3, 2014.  A summary of her findings is as follows:

1. Collins met the insured status requirements of the Social Security Act through December 31, 2014. (Tr. 135)

15

2. Collins had not engaged in substantial gainful activity since March 29, 2009, the alleged onset date.  (Tr. 135)

3. Collins had the following severe impairments: osteoarthritis of the knees, diabetes mellitus, and peripheral neuropathy.  (Tr. 135)

4. Collins did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (Tr. 138)

5. Collins had the residual functional capacity ("RFC") to perform reduced range light work with the following exertional and nonexertional limitations: she could lift or carry up to 20 pounds occasionally, 10 pounds frequently; she was able to stand or walk for two hours out of an eight-hour work day; she was able to sit for six hours of an eight-hour work day; she could sit for sixty minutes at a time and stand for thirty minutes a time.  She had unlimited ability to push and pull other than already stated for lift and/or carry limitations.  She could occasionally climb ramps and stairs; she could never climb ladders, ropes and scaffolds and she could occasionally kneel, crouch and crawl.  (Tr. 142)

6. Collins was unable to perform any past relevant work.  (Tr. 142)

7. Collins was born on July 31, 1961 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability date.  She subsequently changed age categories to closely approaching advanced age. (Tr. 146)

8. Collins had a limited education and was able to communicate in English.  (Tr. 146)

9. Transferability of job skills was not material to the determination of disability because Ms. Collins was not disabled, whether or not she had transferable job skills.  (Tr. 146)

10. Considering Ms. Collins's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could perform.  (Tr. 146)

Based on these findings, the ALJ determined that Collins had not been under a disability from March 29, 2009 through April 3, 2014 (the date of the ALJ's decision).  (Tr. 147)

## VI.  Parties' Arguments

Plaintiff filed her brief on the merits on May 11, 2016. (Doc. 19)  Plaintiff contends that

16

the ALJ should have determined that plaintiff's mental impairments were severe at Step Two. (Doc. 19, pp. 10-13)  She also argues that the ALJ failed to assign the appropriate weight to the opinion of Dr. Duval, plaintiff's treating psychologist.  (Doc. 19, pp. 13-15)  Finally, plaintiff argues that the ALJ failed to resolve a conflict between the Dictionary of Occupational Titles and the VE's testimony.  Plaintiff argues that this case must be remanded due to the legal errors in the ALJ's decision. (Doc. 19, pp. 15-17)

Defendant filed a brief on the merits on June 23, 2016.  (Doc. 20)  Defendant argues that substantial evidence supported the ALJ's finding that plaintiff's mental impairments were non-severe.  (Doc. 20, pp. 7-10)  Defendant also contends that the ALJ properly weighed the opinion of Dr. Duval and reasonably relied on the VE's testimony.  (Doc. 20, pp. 10-13)

## VII.   Law & Analysis

### A.  Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact,

17

if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3).

The findings of the Commissioner are not subject to reversal merely because there exists in the

record substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762,

772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v.*

*Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also

support another conclusion, the decision of the Administrative Law Judge must stand if the

evidence could reasonably support the conclusion reached."  *See Key v. Callahan,* 109 F.3d 270,

273 (6th Cir. 1997).  This is so because there is a "zone of choice" within which the

Commissioner can act, without the fear of court interference.  *Mullen,* 800 F.2d at 545 (*citing*

*Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

 In addition to considering whether the Commissioner's decision was supported by

substantial evidence, the court must determine whether proper legal standards were applied.

Failure of the Commissioner to apply the correct legal standards as promulgated by the

regulations is grounds for reversal.  *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th

Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported

by substantial evidence, however, a decision of the Commissioner will not be upheld where the

SSA fails to follow its own regulations and where that error prejudices a claimant on the merits

or deprives the claimant of a substantial right.")

 Finally, a district court cannot uphold an ALJ's decision, even if there "is enough

evidence in the record to support the decision, [where] the reasons given by the trier of fact do

not build an accurate and logical bridge between the evidence and the result."  *Fleischer v.*

*Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307

(7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D.

Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B. ALJ's Finding that Plaintiff's Mental Impairment was Non-Severe

Ms. Collins argues that the ALJ erred by failing to determine that her mental impairments were "severe" at step two.  The severity determination is "a *de minimis* hurdle in the disability determination process." *Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir. 1998). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education and experience." *Id.* The goal of the test is to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs.,* 773 F.2d 85, 89 (6th Cir. 1985).

The regulations provide a "special technique" for evaluating the severity of a mental impairment at steps two and three. 20 C.F.R. § 404.1520a(a). This special technique must be followed at each level in the administrative review process. *Id.* At step two, an ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment(s)." *Id*. § 404.1520a(b)(1).  If the claimant has a medically determinable mental impairment, the ALJ "must then rate the degree of functional limitation resulting from the impairment(s)" with respect to "four broad functional areas": "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *Id.* §§ 404.1520a(b)(2), (c)(3).  These four functional areas are commonly known as the "B criteria." See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 et seq.; *Craft v. Astrue,* 539 F.3d 668, 674 (7th Cir. 2008).  The degree of limitation in the first three

19

functional areas is rated using the following five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4).  The degree of limitation in the fourth functional area (episodes of decompensation) is rated using the following four-point scale: none, one or two, three, four or more. *Id.* If the ALJ rates the first three functional areas as "none" or "mild" and the fourth area as "none," the impairment is generally not considered severe and the claimant is conclusively not disabled. *Id.* § 404.1520a(d)(1).  Otherwise, the impairment is considered severe and the ALJ will proceed to step three. See *Id.* § 404.1520a(d)(2).

Here, the ALJ determined that plaintiff had a mild limitation in activities of daily living. (Tr. 137)  The ALJ pointed to the plaintiff's reported daily activities and also referenced the opinions of Dr. Richetta and Dr. Duval in making this determination. (Tr. 137)  She next determined that plaintiff was only mildly limited in the area of social functioning. (Tr. 137)  The ALJ noted that plaintiff had a good relationship with her husband and daughters and would go to breakfast with a friend once in a while. (Tr. 137)  The ALJ also noted that plaintiff had reported improvement with the prescription Zoloft and that plaintiff was able to "help her family more." (Tr. 137)  The ALJ determined that plaintiff had a mild limitation in the area of concentration, persistence and pace. (Tr. 137-138)  In support of this determination, the ALJ noted that plaintiff could drive and negotiate the local community. (Tr. 137)  She also stated again that plaintiff was now taking Zoloft.  (Tr. 138)  Finally, the ALJ noted that plaintiff had not suffered any periods of decompensation. (Tr. 138)

The court should find that the ALJ erred in finding that plaintiff's mental impairments were not severe.  As stated above, the severity determination is a *de minimis* hurdle in the disability determination process.  Two of the physicians who provided medical opinions regarding plaintiff's mental limitations said that plaintiff was more than mildly limited in the

area of concentration, persistence and pace.  Dr. Richetta stated that plaintiff's adjustment disorder with depressed mood, chronic, caused "very reduced concentration, reduced persistence, insomnia and reduced energy." (Tr. 530)  Dr. Duval opined that plaintiff could rarely deal with work stress and would rarely be able to perform at a consistence pace.  (Tr. 948)

In finding that plaintiff was only mildly limited in the functional area of concentration, persistence or pace, the ALJ rejected plaintiff's statement to Dr. Richetta that she was having trouble finishing tasks.  The ALJ noted that plaintiff was able to drive and negotiate the local community and that plaintiff improved once she started taking Zoloft.  (Tr. 137-138)  These were the only supportive facts that the ALJ referenced in deciding that plaintiff was only mildly limited in the area of concentration, persistence, or pace.  It is unclear how plaintiff's ability to drive or her prescription for an anti-depressant support the ALJ's finding.  These facts do not directly relate to plaintiff's limitation in the areas of concentration, persistence or pace.

As stated above, if the ALJ rated the first three functional areas as "none" or "mild" and the fourth area as "none," the impairment is generally not considered severe and the claimant is conclusively not disabled. *Id.* § 404.1520a(d)(1). Otherwise, the impairment is considered severe and the ALJ will proceed to step three. See *Id.* § 404.1520a(d)(2).  Here, even if the ALJ properly determined that plaintiff had no limitations or only moderate limitations in the other functional areas, her decision that plaintiff was only mildly limited in the functional areas of concentration, persistence and pace was not supported by substantial evidence in the record.

Notwithstanding this error, the court's review is not complete, because once an ALJ determines that one of the claimant's impairments are severe, she must consider all the claimant's severe and non-severe impairments in the remaining steps of the sequential analysis. Thus, the fact that the mental impairments of Ms. Collins were not deemed to be severe at step

21

two could be considered legally irrelevant, if the ALJ considered them in the remaining steps of

the sequential analysis. *See Anthony v. Astrue,* 266 Fed. Appx. 451, 457 (6th Cir. Ohio 2008),

citing *Mariarz v. Sec'y of Health & Human Servs.,* 837 F.2d 240, 244 (6th Cir. 1987) (holding

that the failure to find that an impairment was severe was harmless error where other

impairments were deemed severe).

Here, the ALJ determined that plaintiff suffered from severe impairments of osteoarthritis

of the knees, diabetes mellitus, and peripheral neuropathy.  Because the ALJ determined that

plaintiff suffered from severe physical impairments, she was required to consider plaintiff's

mental impairments in the remaining steps of her analysis, including her assessment of plaintiff's

residual functional capacity.  *See Simpson v. Comm'r of Soc. Sec.,* 344 Fed. App'x. 181, 2009

U.S. App. LEXIS 19206 (6th Cir. 2009).

In discussing plaintiff's residual functional capacity, the ALJ focused on plaintiff's

physical impairments and did not adequately consider plaintiff's mental impairments.  The ALJ

briefly discussed plaintiff's mental impairments because opinion evidence had been submitted

regarding them.  In addressing the "additional opinion evidence," the ALJ stated the following:

> Although Dr. Richetta diagnosed the nature of the claimant's psychological
> symptoms, the evidence as a whole does not establish that these psychological
> symptoms have imposed more than minimal limitations to the claimant's work-
> related mental functioning during the current adjudicating period.  Accordingly,
> the understated gives limited weight to Dr. Richetta's opinion to the extent the
> claimant has a medically determinable mental impairment only, and not one that
> is severe.

(Tr. 144)

Regarding plaintiff's treating physician, Dr. Duval, the ALJ stated:

> Based on, [*sic*] the undersigned gives less weight to a treating source statement
> from the claimant's psychologist Dr. Duval because his checklist-findings are not
> consistent with the claimant's documented longitudinal ameliorative response to

22

> counseling and psychotropic medication as presented in Dr. Duval's own
> treatment notes.

(Tr. 144)

The ALJ provided no other explanation for her rejection of the opinions of these medical providers who evaluated or treated plaintiff.  In addition to violating the treating source rule, as is further discussed below, the ALJ did not consider plaintiff's mental impairments in her analysis of plaintiff's residual functional capacity.  The ALJ did not further discuss plaintiff's mental impairments in her decision and there is no indication that the mental impairments were considered in formulating the hypothetical questions to the VE.  For these reasons, the court should find that the ALJ failed to properly analyze plaintiff's mental impairments in Step Two and in the remaining steps of her analysis, as she was required to do.  The undersigned recommends that the Commissioner's final agency action be vacated and the matter be remanded for further consideration of plaintiff's mental impairments.

## C.  Treating Physician Rule

Plaintiff also argues that the ALJ did not articulate good reasons for failing to assign controlling weight to the opinion of plaintiff's treating psychologist, Dr. Duval.  The administrative regulations implementing the Social Security Act impose standards on the weighing of medical source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  In making determinations of disability, an ALJ evaluates the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the

other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If the ALJ does not give the opinion controlling weight, then the opinion is still entitled to significant deference or weight that takes into account the length of the treatment and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)-(6).  The ALJ is not required to explain how she considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation marks omitted).

A failure to follow these procedural requirements "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007).  The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original)

24

(internal quotation marks omitted).

The ALJ's "good reasons" must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).  As the Sixth Circuit has noted,

> the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id.* at 377.  On the other hand, the ALJ is not obligated to provide an "exhaustive factor-by-factor analysis."  See *Francis v. Comm'r of Soc. Sec.* 414 Fed. Appx. 802, 804 (6th Cir. 2011).

In deciding that Collins had the residual functional capacity to perform a reduced range of light work, the ALJ assigned "less weight" to the opinion of plaintiff's treating psychologist, Dr. Duval.  (Tr. 144)  The ALJ provided little (if any) explanation for the weight she assigned to Dr. Duval. (Tr. 144)  In fact, the ALJ's decision appears to have a typographical error.  It states, "Based on, the undersigned gives less weight to" the source statement of plaintiff's psychologist, Dr. Duval.  The ALJ didn't explain on *what* this decision was based.  The ALJ stated that Dr. Duval's findings were inconsistent with the claimant's longitudinal ameliorative response to counseling and medication as presented in his own treatment notes.  (Tr. 144)  However, the ALJ did not point to or reference a single treatment note which she believed was inconsistent with Dr. Duval's findings.  Even after plaintiff began taking medication and improving in some areas, Dr. Duval's notes contained statements that plaintiff "remained very unsure of herself and her

future," and that she was struggling with "sensitivity and fear of the future." (Tr. 771-772)  It is unclear how Dr. Duval's notes were inconsistent with his treating source opinion he provided regarding plaintiff's mental capacity.  The ALJ did not provide a sufficiently specific explanation for her decision not to assign controlling weight to Dr. Duval's opinion.  The undersigned recommends that the Commissioner's decision be vacated and the matter be remanded for further consideration on this basis.[3]

### D.  Conflict Between the DOT and the VE's Testimony

Plaintiff finally argues that the ALJ erred in failing to resolve a conflict between the VE's testimony and the Dictionary of Occupational Titles.  Given the recommendation that the case be remanded on other grounds, it may be unnecessary for the undersigned to fully consider this final argument by plaintiff.  Nonetheless, the undersigned notes that, even if there were an inconsistency between the VE's testimony and the DOT, the plaintiff has not pointed to any authority that the ALJ erred in her findings based on the VE's testimony, which went unchallenged by the plaintiff until after the ALJ issued her decision.  Neither the ALJ nor the VE is required to follow the DOT. *Wright v. Massanari,* 321 F.3d 611, 616 (6th Cir. 2003) (holding that "the ALJ and consulting vocational experts are not bound by the Dictionary in making disability determinations because the Social Security regulations do not obligate them to rely on the Dictionary's classifications").  The ALJ complied with SSR 00-4p, by asking the VE whether the testimony he provided was consistent with the information found in the *Dictionary of Occupational Titles* and its companion publication, *Selected Characteristics of Occupations.*

---

[3] In making this recommendation, the undersigned is saying nothing that should be taken to be an endorsement of the quality of the evidence related to plaintiff's alleged mental impairments.  The court finds the checklist approach utilized by Dr. Duval to be less than helpful in the evaluation of the issues presented.  Moreover, Dr. Duval's office notes, skimpy though they may be, seem to provide scant support for his sweeping checklist-opinions.

See *Lindsley v. Comm'r of Soc. Sec.,* 560 F.3d 601, 606 (6th Cir. 2009), (holding that the ALJ fulfilled his duties when he asked the VE whether there was any "discrepancy between your opinions and the DOT standards," even if the VE did not disclose a conflict).  The ALJ is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by SSR 00-4p.  *Id.*  Such an obligation fell to plaintiff's counsel, who had the opportunity to cross-examine the VE to bring out any conflicts with the DOT.  *Beinlich v. Comm'r of Soc. Sec.,* 345 Fed. Appx. 163, 168-169 (6th Cir. Ohio 2009)  The fact that plaintiff's counsel did not do so would not be grounds for relief. *Id.,* citing *Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir. Dec. 19, 2008)  Accordingly, the undersigned would not recommend remand on this basis. However, the undersigned has recommended that the final decision of the Commissioner be vacated and the matter be remanded for the reasons already stated herein.

**VIII.   Conclusion**

For the foregoing reasons, it is recommended that the final decision of the Commissioner be VACATED and that the case be REMANDED, pursuant to 42 U.S.C. § 405(g), for further proceedings consistent with this Report and Recommendation.


Dated: August 11, 2016

Thomas M. Parker
United States Magistrate Judge


**OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**